**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| SUNRISE IMPORTS, LLC, and CURRAN VOLKSWAGEN, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, VOLKSWAGEN AG, a publicly traded German corporation, SCOUT MOTORS, INC., a Virginia Corporation, and SCOUT MOTORS SALES LLC, a limited liability corporation,<br><br>Defendants. | Case No. 1:26-cv-621<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 4

III. PARTIES ..... 4

A. Plaintiffs ..... 4

1. Plaintiff Sunrise Imports ..... 4

2. Plaintiff Curran Volkswagen ..... 5

B. Defendants ..... 5

1. Volkswagen AG ..... 5

2. Volkswagen Group of America, Inc. ..... 5

3. Scout Motors, Inc. ..... 6

4. Scout Motors Sales LLC ..... 6

IV. FACTUAL ALLEGATIONS ..... 6

A. The Volkswagen Dealer Agreement ..... 6

B. Background on auto dealer fairness laws ..... 7

C. Defendant's knowledge of the prohibition against direct sales to consumers. ..... 8

D. The creation of Scout Motors to act as VW's alter ego. ..... 9

E. Scout's leadership structure proves it is the alter ego and agent of Volkswagen ..... 12

V. ALTER EGO ALLEGATIONS ..... 14

VI. CLASS ACTION ALLEGATIONS ..... 14

VII. CLAIMS ..... 17

COUNT I: BREACH OF CONTRACT (on behalf of a Nationwide Class) ..... 17

COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS ..... 19

COUNT III: CONSPIRACY TO INJURE A BUSINESS RELATIONSHIP .............................. 21

REQUEST FOR RELIEF .............................................................................................. 23

DEMAND FOR JURY TRIAL ....................................................................................... 23

Plaintiffs Sunrise Imports, LLC and Curran Volkswagen, Inc. bring this action on behalf of themselves and on behalf of all persons and entities in the United States who own or operate a Volkswagen dealership pursuant to the terms of a written Volkswagen Dealer Agreement (the "Class"), and allege upon information and belief and the investigation of counsel as follows:

## I. INTRODUCTION

1. Volkswagen has a statutory and contractual obligation to sell its automobiles directly to VW-authorized dealerships, who in turn sell the vehicles to consumers. But VW is trying to skirt its legal obligations by selling its new electric vehicles, known as Scout vehicles, directly to consumers. To avoid these obligations, VW formed separate companies (defendants Scout Motors, Inc. and Scout Motor Sales LLC) to effectively act as shell corporations for distribution. In truth, Scout is simply an offshoot of Volkswagen, and Volkswagen's decision to sell the Scout EVs is a blatant breach of its contract with the dealers.

2. Scout's website features flashy advertisements that promote the fact that the Scout vehicles are "born from an American legend":[1]




[1] https://www.scoutmotors.com/.

3. In the right-hand corner of the main website, there is a prominent orange box encouraging potential buyers to reserve their purchases of the vehicles:




4. By clicking on "RESERVE NOW," customers are offered a chance to "Reserve your spot in line for $100 USD" (these vehicles are still in production). Customers are further prompted to "SELECT A VEHICLE," featuring an SUV (the "Traveler") and a pickup (the "Terra"). Customers are then asked to pick an energy system, which feature either a fully electric or a hybrid option:



Directly below this box, customers provide their credit card and personal information to reserve their purchase. Over 150,000 individuals have paid for reservations to purchase the Scout vehicles.[2]

5. VW dealerships are accordingly being deprived of their right and ability to sell these cutting-edge vehicles, at significant financial cost to the dealers. The standard Dealer Agreement, and accompanying "Standard Provisions" document, prohibits Volkswagen from selling directly to consumers. Not only are the dealers losing their opportunity to collect $100 from every purchaser and make a profit from the vehicle's sale, they are also injured by lost opportunities to finance, service and repair the vehicles, and to cross-sale these and other VW vehicles, both now and in the future.

6. Plaintiffs—all of whom are VW dealers—accordingly bring this action on behalf of themselves and all other VW dealerships across the country for breach of contract, as Volkswagen Group of America ("VWGofA") is violating its standard Dealer Agreements by attempting to sell the Scout vehicles directly to consumers, and the Scout Defendants, as the alter egos of VW, are aiding and abetting that breach. As detailed herein, Volkswagen AG is directing, supervising, and funding the development of the Scout vehicles, and aiding and abetting VWGofA's breach. In the alternative, Plaintiffs also bring claims for (i) tortious interference with contract against the Scout Defendants, for their acts to interfere with the VW-dealer agreements; and conspiracy to injure a business relationship (VA Code Ann. § 18.2-499) against all defendants, for working together to circumvent Volkswagen's obligation to sell the Scout vehicles through the

[2] https://www.scoutforums.com/forum/threads/scout-has-150k-reservations-now-85-are-for-harvester-erev-hybrid.16951/.

dealers. Plaintiffs seek damages (including punitive and treble damages), injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. This Court also has subject matter jurisdiction and personal jurisdiction pursuant to the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.*

8. This Court has personal jurisdiction over each Defendant because these Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) their principal place of business in this District; (4) had substantial contacts with the United States, including in this District; and (5) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

9. Venue is proper in this District because each Defendant has its principal place of business in this District, and has had continuous and systematic contacts with this District, as alleged throughout this Complaint.

## III. PARTIES

### A. Plaintiffs

#### 1. Plaintiff Sunrise Imports

10. Plaintiff Sunrise Imports, LLC is a New York Corporation doing business as Volkswagen of West Islip, a duly authorized and franchised Volkswagen Dealership in West Islip, Long Island. Plaintiff Sunrise Imports entered into the standard Dealer Agreement with

Volkswagen, which included the Standard Provisions document. If provided the opportunity, Plaintiff Sunrise Imports would showcase, sell, and service Scout Vehicles at its dealership.

**2. Plaintiff Curran Volkswagen**

11. Plaintiff Curran Volkswagen is a Connecticut corporation, which owns a duly authorized and franchised Volkswagen dealership in Stratford, Connecticut. Plaintiff Curran Volkswagen entered into the standard Dealer Agreement with Volkswagen, which included the Standard Provisions document. If provided the opportunity, Plaintiff Curran Volkswagen would showcase, sell, and service Scout Vehicles at its dealership.

**B. Defendants**

**1. Volkswagen AG**

12. Defendant Volkswagen AG ("VWAG") is a German corporation with its principal place of business in Wolfsburg, Germany. VWAG is one of the largest automobile manufacturers in the world and is in the business of designing, developing, testing, manufacturing, and selling automobiles. VWAG is the parent corporation of VWGofA. VWAG has been traded in the United States via American depository receipts since 1988, on the OTC Marketplace.

**2. Volkswagen Group of America, Inc.**

13. Defendant Volkswagen Group of America ("VWGofA") is a New Jersey corporation doing business throughout the United States. VWGofA's corporate headquarters is located in Herndon, Virginia. VWGofA is a wholly-owned subsidiary of WVAG, and it engages in business activities in furtherance of the interests of VWAG, including the advertising, marketing and sale of VW automobiles nationwide. At all relevant times, VWGofA acted as an authorized agent, representative, servant, employee, and/or alter ego of WVAG while conducting its business, including the development, marketing, and sale of VW vehicles in the United States, including substantive activities that occurred within this jurisdiction.

**3. Scout Motors, Inc.**

14. Defendant Scout Motors, Inc. is a Virignia corporation with its principal place of business in McLean, Virginia. Scout Motors is wholly owned by VWAG, which acquired the Scout brand after purchasing American truck manufacturer Navistar International in 2021.

**4. Scout Motors Sales LLC**

15. Defendant Scout Motors Sales LLC is a Delaware limited liability company with its principal place of business in McLean, Virginia. Scout Sales is a wholly owned direct subsidiary of Scout Motors, and accordingly is a 100% indirect subsidiary of VWAG.

## IV. FACTUAL ALLEGATIONS

### A. The Volkswagen Dealer Agreement

16. Each Volkswagen dealership across the country enters into a standard "Dealer Agreement," which in turn incorporates by reference a "Standard Provisions" document, which is expressly incorporated into the Dealer Agreement:

> 2. STANDARD PROVISIONS. The Dealer Agreement Standard Provisions (the "Standard Provisions"), the Dealer Operating Plan (the "Operating Plan") and the Volkswagen Dealer Operating Standards (the "Operating Standards") are part of this Agreement. Any term not defined in this Agreement has the meaning given such term in the Standard Provisions.

17. The Standard Provisions document imposes the following obligations on VWoA:

a. "VWoA will sell and deliver Authorized Products to Dealer in accordance with this Agreement."

b. "In the conduct of its business, VWoA will: []

i. "Avoid all discourteous, deceptive, misleading, unprofessional or unethical practices."

18. As detailed herein, Defendants have breached, and aided and abetted the breaching of, the Dealer Agreement and its Standard Provisions by refusing to sell "Authorized Products" to

the dealers. As detailed below, Defendants have also engaged in discourteous, deceptive, misleading, unprofessional and unethical practices by violating state statutes that prohibit direct to consumer sales.

**B. Background on auto dealer fairness laws.**

19. Automotive dealerships are entirely dependent on auto manufacturers ("OEMs") for the supply of new vehicles for sale. This creates a power dynamic that even the U.S. Supreme Court identified as ripe for abuse: "[The] vast disparity in economic power and bargaining strength has enabled the [manufacturer] to determine arbitrarily the rules by which the two parties conduct their business affairs." *New Motor Vehicle Bd. of Cal. V. Orrin W. Fox Co.*, 439 U.S. 96, 100 n.4 (1978). As a result, "Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, [the dealer] becomes in a real sense the economic captive of [the dealer's] manufacturer." *Id.* (quoting S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956)).

20. In response, states have enacted auto dealership laws to protect against OEM's sharp tactics. For example, New York law holds that an OEM may not "withhold from a franchised motor vehicle dealer a new motor vehicle product of the same line-make which the franchised motor vehicle dealer is authorized to sell under its franchise." N.Y. Veh. & Traf. L. § 463(2)(w). As a result, a dealer who has previously entered into a franchise agreement with Volkswagen for the sale and service of a particular new motor vehicle product of the same line make, under the Act, must, as a matter of law, be afforded the right to sell any Volkswagen electric vehicle. Volkswagen is further prohibited from using Scout as a shell corporation to evade the New York Dealer Act's provisions. *See id.* § 463(2)(u).

21. Defendants are trying to unilaterally usurp this system, which so far has been mutually beneficial for all parties. During the Volkswagen "dieselgate" crisis, for example,

Volkswagen's decision to cheat on emissions tests for VW vehicles profoundly impacted VW dealers, who were stuck with vehicles that no one wanted to buy, and which tarnished the brand and caused a loss of good will. VW dealers nevertheless stuck with the company, based on the agreement and understanding that VW would continue to use dealers to sell its vehicles. Dealers relied on this expectation as they modernize their dealerships, expand their operations, and plan for future sales of VW vehicles. Defendants are trying to undermine this entire system to earn a quick profit from EV sales, with broad implications for the industry. According to a recent Comment in AutoNews, "if legacy manufacturers can simply slap a new badge on a vehicle and declare themselves a 'startup,' the franchise system is done."[3]

**C. Defendant's knowledge of the prohibition against direct sales to consumers.**

22. Defendants fully understand that direct sales are illegal. In California, Scout Motors relentlessly lobbied the California legislature to amend a law related to direct sales. According to an April 2023 report from the California Assembly Committee on Transportation, Scout Motors opposed the bill, because (in Scout's view) it constituted an overly broad prohibition on direct-to-consumer sales.[4]

23. Although the Committee partly amended the bill in response to those criticisms, it noted that the amended bill "***would still prohibit Scout Motors or any new vehicle line from a manufacturer with a dealership network in California from being sold directly to customers*** Volkswagen, the parent company of Scout Motors, could sell Scout vehicles in the state if they sell them at any of their other vehicle line company's dealerships like Volkswagen, Audi, Porsche, Bently or Lamborghini." *Id.* (emphasis added). The Committee also commented that VW "could

[3] *See* https://issue.autonews.com/infinity/article_popover_share.aspx?guid=536166db-c182-4566-883c-1179e4b9a936&share=true.

[4] *See* atrn.assembly.ca.gov/sites/atrn.assembly.ca.gov/files/AB%20473.pdf.

also create a new franchise network for Scout Motors if they want to keep a separate brand distinct from their other models." *Id.*

24. In response, Scout wrote a letter to the California legislature, complaining that the amended bill "could effectively prohibit Scout Motors [] from entering the California market. Under this language, a new-to-the-market manufacturer with new and innovative EVs would be statutorily banned from deciding [sic] its distribution model in California, potentially killing off any reasonable opportunity to operate in the state."[5] And on February 6, 2025, the co-sponsor of the California bill (Rep. Cecilia Aguiar-Curry) wrote a letter to Neil Sitron (Scout's General Counsel) and Antony Klapper (Senior Vice President and General Counsel of VWAG), and stated that "VW and Scout have begun accepting deposits for Scout vehicles directly from California residents, excluding existing or future franchised dealers from the sales and service process." [6] But Representative Aguiar-Curry warned Defendants that accepting these deposits violates California law, "which expressly forbids an automaker from competing with its own dealers through an affiliate brand." *Id.*

**D. The creation of Scout Motors to act as VW's alter ego.**

25. From this series of events, Volkswagen and Scout were fully on notice that they could not sell to consumers directly. But they are doing so anyway, based on the fiction that Scout is separate from Volkswagen. But that fiction is easily disproven, as even Scout boasts about its close connection to Volkswagen. As it states on its website:

---

[5] *See* www.cncda.org/wp-content/uploads/2024.12.20-Cease-and-Desist-Letter-to-Scout-and-VW.pdf.

[6] *See* https://www.cncda.org/wp-content/uploads/4024-04-22-FILED-Complaint_Case_InitiationVolkswagen.pdf, at Ex. C.

**Backed by an industry titan**

Automotive manufacturing is not for the faint of heart. The challenge, however, becomes less daunting with the backing of Volkswagen Group. Their manufacturing prowess is leveraged in Blythewood, South Carolina to produce high quality Scout vehicles.

26. Scout's website also makes it plain that it is inseparable from Volkswagen. According to Scout, "Scout Motors is backed by Volkswagen AG, a publicly traded German company, making it a member of the Volkswagen Group. This partnership provides Scout Motors with deep expertise in vehicle and production engineering, enabling a rapid ramp-up of high-quality manufacturing."[7]

27. Volkswagen AG obtained the Scout brand when it acquired American truck manufacturer International Motors (f/n/a Navistar) in 2021. According to Volkswagen, the Scout initiative "was a key part of its goal of reaching 10% market share in the United States."[8]

28. The genesis of Scout vehicles came from Volkswagen as well. As a September 2021 *Motor Trend* article summarized, "Volkswagen insiders are considering building an all-electric off-roader to go up against the Wrangler and Bronco, and they want to call it the Scout[.] Volkswagen Group of America Chief Operating Officer Johan De Nysschen floated the idea during a conversation with the media at a recent press event. De Nysschen noted the larger

---

[7] *See* https://support.scoutmotors.com/en/articles/10034676-is-scout-motors-a-part-of-volkswagen.

[8] https://www.reuters.com/business/autos-transportation/volkswagen-says-top-us-executive-run-new-scout-company-2022-07-19/

Volkswagen Group now owns the rights to the Scout name[.]"[9] Scout also relies on software for the vehicles that was "built by the Volkswagen Group-Rivian joint venture."[10]

29. The profit potential of Scout vehicles is being promoted at the very top of Volkswagen. According to an article in *Automotive News* entitled "With Scout and Cupra Inbound, Blume Confident on VW Group's Fortunes in U.S.," Volkswagen Group's CEO Oliver Blume expressed confidence that the group "can achieve greater sales volume in the United States" through the Scout brand.[11] According to the article, "Blume said the billions of dollars VW has invested in North America over the years signals the group's strong commitment to the region," including "the creation of Scout Motors and its plan in South Carolina[.]" *Id.*

30. According to VW Group's 2024 report, "[i]n fiscal year 2024, Volkswagen AG acquired the shares of Scout Motors" for six hundred million euros.[12] According to this report, VW Group is "also working intensively on offering additional products specifically tailored to the US market. By developing and producing a full-size pick-up and a robust SUV, the Volkswagen Group plans to tap into the electric vehicle market with the US brand icon Scout." *Id.* at 194.

31. The report also reveals the following (*id.* at 484; emphasis added):

> Under the Volkswagen Group's North America strategy, Scout Motors Inc., Tysons/USA, a wholly owned subsidiary in the Volkswagen Group, was established in fiscal year 2022. ***A new vehicle brand is to be created under the name of Scout to manufacture electrified all-terrain vehicles and pickups in the USA from 2027***. In order to finance the creation of the Scout brand, as well as vehicle development and production planning, an amount of USD 493 million was

[9] https://www.motortrend.com/news/volkswagen-international-harvester-scout-ev.

[10] https://www.scoutmotors.com/newsroom/scout-motors-vehicles-will-be-among-the-first-to-use-the-new-zonal

[11] https://www.autonews.com/volkswagen/an-ces-2025-blume-vw-group-outlook/.

[12] *See* https://uploads.vw-mms.de/system/production/documents/cws/002/931/file_en/953dcbb8e57270df70ca288218092dba4721fd63/Y_2024_e.pdf?1742480062, at 136.

> contributed to the company in fiscal year 2023. The company has been included in the Volkswagen consolidated financial statements since January 1, 2023.

32. Finally, Scout's CEO, Scott Keogh, has confirmed that Scout acts as the alter ego of Volkswagen. In a recent podcast on the MotorTrend channel, Mr. Keogh had the following exchange with the host (emphasis added): [13]

> [Host]: Can you explain the relationship with Volkswagen? Because it's like not a Volkswagen brand, but it is a Volkswagen brand; you're autonomous but you're not."
>
> [Keogh]: We've said it 100 times; you guys like half listen. . . . First and foremost, **100% Scout Motors is part of the Volkswagen Group**. . . . ***Scout Motors is a LLC, and reports into the Volkswagen Group directly in Germany***. So for me, for example, I report into the Board. We have board meetings there, we give them updates, away we go. They are the sole provider, funder of the company as of right now, but we've structured the company in a way that if we want to be strategic partners with someone else, if we want to seek outside capital, if potentially we want to go public, the company's been structured to do that.

**E. Scout's leadership structure proves it is the alter ego and agent of Volkswagen.**

33. Scout's leadership primarily consists of ex-VW officers and executives, belying any notion that Scout is a separate organically grown entity. Most prominently, Scott Keogh, the President and CEO of Scout Motors, was previously the President and CEO of Defendant Volkswagen Group of America Inc. Other examples include:

- Scout's Chief Production Officer, Oliver Woolinsky, previously served as the Plant Manager for SAIC Volkswagen, a joint venture with a Chinese entity, where he "spearheaded development of the Volkswagen Group's first manufacturing site dedicated exclusively to electric vehicle production."[14]

---

[13] *See* https://www.youtube.com/watch?v=hHNgPE0csAA.

[14] https://www.scoutmotors.com/newsroom/scout-motors-appoints-new-chief-production-officer.

Scout's previous production designer, Dr. Jan Spies, spent more than two decades at the Volkswagen Group.[15]

- Scout's Vice President of Commercial Operations, Cody Thacker, worked at Audi of America for over eight years, including serving as the "leader of electric vehicle strategy and EV ecosystem development in the US market for Audi of America."[16]
- Scout's Vice President of Administration, Ryan S. Rose, worked at Volkswagen of America for over fourteen years, including serving as Chief Environmental Officer from 2019 to 2022.[17]
- Scout's Vice President of Products, Andreas Adam, spent nearly 19 years at Volkswagen Commercial Vehicles.[18]
- Scout's Chief Information Officer, Lynn Longo, was the Chief Technology Officer for Volkswagen AG's software division.[19]
- Scout's Chief Technical Officer, Dr. Burkhard Huhnke, previously spent 20 years with the Volkswagen Group, where he "initiated and co-founded the Volkswagen Automotive Innovation Center at Stanford University."[20]

---

[15] https://www.scoutmotors.com/newsroom/scout-motors-appoints-chief-production-officer-begins-local-hiring-in-south-carolina.

[16] https://www.linkedin.com/in/cody-thacker-4803189/details/experience/.

[17] https://www.linkedin.com/in/ryan-s-rose/.

[18] https://www.linkedin.com/in/andreas-adam-586a6a150/.

[19] https://www.linkedin.com/in/lynn-longo-7763754/.

[20] https://www.scoutmotors.com/newsroom/scout-motors-appoints-chief-technical-officer.

## V. ALTER EGO ALLEGATIONS

34. At all times mentioned herein, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of each of the other Defendants and, in doing such things as herein alleged, was acting within the scope and course of its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

35. At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

36. At all times herein mentioned, the acts and omissions of Defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

37. At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## VI. CLASS ACTION ALLEGATIONS

38. Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following Class:

> All persons and entities in the United States who own or operate a Volkswagen dealership pursuant to the terms of a written Volkswagen Dealer Agreement.

39. Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding

over this action and the members of their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

40. The Class is readily ascertainable because records of the relevant Dealer Agreements and Scout vehicle transactions should exist and are easily obtainable.

41. The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has at least hundreds of members, the exact number and their identities being known to Defendants.

42. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

43. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

a. Whether Defendants engaged in the alleged conduct;

b. Whether Defendants' conduct violates the applicable Dealer Agreements, as alleged herein;

c. Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

d. Whether Defendants' conduct is unlawful; and

e. The appropriate class-wide measures of damages.

44. Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to each member. There are no defenses available to Defendants that are unique to Plaintiffs or to any particular Class.

45. Plaintiffs will fairly and adequately represent and protect the interests of the Class, has no interest incompatible with the interests of the Class, and has retained counsel competent and experienced in class action and automotive franchise law.

46. A class action is the superior method for the efficient adjudication of this litigation because individual litigation would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class members' claims, no Class member could assume the business risk to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint. Additionally, Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

47. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VII. CLAIMS

### COUNT I:

### BREACH OF CONTRACT
### (on behalf of a Nationwide Class against all Defendants)

48. Plaintiffs bring this claim for themselves and on behalf of the Nationwide Class against all Defendants. The preceding paragraphs are re-alleged as if fully set forth herein.

49. The elements of breach of contract claim are substantially the same across the 50 states,[21] and require Plaintiffs to allege (1) existence of a legally enforceable contract; (2) breach; and (3) damages.[22]

---

[21] *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("Contract law is not at its core diverse, nonuniform, and confusing"); *In re: MI Windows and Doors Inc. Prods. Liab. Litig.*, 2015 WL 12850547, at *6 (D.S.C. July 22, 2015) ("A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey.") (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1263 (11th Cir. 2004)).

[22] *See Phoenix v. Vital Core Health Strategies*, 2025 WL 2313208, at *3 (E.D. Va. Aug. 11, 2025).

50. The binding Volkswagen Dealer Agreement between Volkswagen and each dealer incorporates by reference a "Standard Provisions" document. These Standard Provisions impose the following obligations on VWoA:

a. "VWoA will sell and deliver Authorized Products to Dealer in accordance with this Agreement."

b. "In the conduct of its business, VWoA will: []

i. "Avoid all discourteous, deceptive, misleading, unprofessional or unethical practices."

51. Defendants have materially breached, and aided and abetted the breach, of these provisions because they are not "sell[ing] and deliver[ing] Authorized Products to Dealer in accordance with this Agreement," as detailed herein.

52. Nor are Defendants "avoid[ing] all discourteous, deceptive, misleading, unprofessional or unethical practices" because they are violating the state dealership statutes that prohibit direct sales to consumers. Pursuant to the New York Dealer's Act, a manufacturer may not "withhold from a franchised motor vehicle dealer a new motor vehicle product of the same line make which the franchised motor vehicle dealer is authorized to sell under its franchise." N.Y. Veh. & Traf. L. § 463(2)(w). Similarly, pursuant to the applicable Connecticut statute, a manufacturer may not "withhold any new motor vehicle from distribution except a vehicle which is part of a demonstration fleet[.]" CGS § 42-133(1)(A).

53. As a result, Defendants are engaging in unfair and unethical conduct by violating the customary practice of OEMs in the automotive retail industry of selling new vehicles solely and exclusively through a nationwide network of duly authorized and franchised Volkswagen dealers.

54. Plaintiffs are accordingly injured by Defendants' breach, including for:

- Loss of customers' $100 deposits, as paid to Scout;
- Prospective vehicle sale profits;
- Future warranty parts and labor revenues;
- Reimbursement for customer-pay future repairs;
- After-sale gross profits, and finance reserves, and insurance commissions;
- Used vehicle trade-in opportunities and related gross profits; and
- Cross sales of other VW model vehicles.

55. Defendants acted with actual malice toward Plaintiffs, and acted under circumstances amounting to a willful and wanton disregard of Plaintiffs' rights.

56. Defendants are liable to Plaintiffs and the Class members in amounts to be proven at trial, including actual damages, punitive damages, attorneys' fees, and costs.

**COUNT II:**

**TORTIOUS INTERFERENCE WITH CONTRACT**
**(on behalf of a Nationwide Class against the Scout Defendants)**

57. Plaintiffs bring this claim for themselves and on behalf of the Nationwide Class against the Scout Defendants. The preceding paragraphs are re-alleged as if fully set forth herein.

58. This claim is pled in the alternative to Count I.

59. To plead tortious interference with contract under Virginia law, Plaintiffs must allege "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of that contractual relationship or business expectancy on the part of the interferor; (3) intentional

interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."[23]

60. At all times material to this Complaint, Plaintiffs and Volkswagen have had a valid contractual relationship and the expectation of business in the future. *See* § IV.A.

61. The Scout Defendants knew about this contractual relationship and business expectancy. The CEO of Scout Motors, Scott Keogh, was the CEO of Defendant VWGofA, and a substantial number of other Scout executives came directly from Volkswagen. *See* § IV.E. The entire purpose of the creation of the Scout Defendants was to void and nullify the contractual relationship between Plaintiffs and Volkswagen and the expectation of business between Plaintiffs and Volkswagen. *See* § IV.C, D.

62. The Scout Defendants intentionally interfered with this contractual relationship and business expectancy, which induced and caused a breach and termination of that relationship and expectancy. Scout Motors is marketing, selling, and collecting reservation fees from U.S. customers, in direct violation of Volkswagen's obligations to sell through VW dealerships. *See* § IV.A, D.

63. Plaintiffs have accordingly been damaged in numerous ways, including the following:

- Loss of customers' $100 deposits, as paid to Scout;
- Prospective vehicle sale profits;
- Future warranty parts and labor revenues;
- Reimbursement for customer-pay future repairs;

[23] *See Lightfoot v. Richmond Public Schools*, 2017 WL 3476224, at *3 (E.D. Va. Aug. 11, 2017).

- After-sale gross profits, and finance reserves, and insurance commissions;
- Used vehicle trade-in opportunities and related gross profits; and
- Cross sales of other VW model vehicles.

64. The Scout Defendants acted with actual malice toward Plaintiffs, and acted under circumstances amounting to a willful and wanton disregard of Plaintiffs' rights.

65. The Scout Defendants are liable to Plaintiffs and the Class members in amounts to be proven at trial, including actual damages, punitive damages, attorneys' fees, and costs.

**COUNT III:**
**CONSPIRACY TO INJURE A BUSINESS RELATIONSHIP**
**(on behalf of a Nationwide Class against all Defendants)**

66. Plaintiffs bring this claim for themselves and on behalf of the Nationwide Class against all Defendants. The preceding paragraphs are re-alleged as if fully set forth herein.

67. This claim is pled in the alternative to Count I.

68. VA Code Ann. § 18.2-499(A) provides liability for "any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his [or her] reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his [or her] will, or preventing or hindering another from doing or performing any lawful act[.]" *See also* VA Code Ann. § 18.2-500(A) ("Any person who shall be injured in his [or her] reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him [or her] sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, 'damages' shall include loss of profits."

69. Each Plaintiff and Defendant is a "person" under VA Code Ann. § 18.2-499 & -500. *See* VA Code Ann. § 18.2-501(b) ("As used in this article a 'person' is any person, firm, corporation, partnership or association.").

70. The Scout Defendants and the Volkswagen Defendants acted in concert and agreed to create the Scout entities for the sole purpose of circumventing Volkswagen's obligations to sell Scout vehicles to VW dealerships. *See* § IV.D., E.

71. The Scout Defendants and the Volkswagen Defendants also willfully and maliciously prevented and hindered Plaintiffs from selling the Scout vehicles by creating the Scout entities for the sole purpose of circumventing Volkswagen's obligations to sell Scout vehicles to VW dealerships. *See* § IV.D., E.

72. In so doing, the Scout Defendants and the Volkswagen Defendants injured Plaintiffs, including in the following ways:

- Loss of customers' $100 deposits, as paid to Scout;
- Prospective vehicle sale profits;
- Future warranty parts and labor revenues;
- Reimbursement for customer-pay future repairs;
- After-sale gross profits, and finance reserves, and insurance commissions;
- Used vehicle trade-in opportunities and related gross profits; and
- Cross sales of other VW model vehicles.

73. The Scout Defendants acted with actual malice toward Plaintiffs, and acted under circumstances amounting to a willful and wanton disregard of Plaintiffs' rights.

74. The Scout Defendants are liable to Plaintiffs and the Class members in amounts to be proven at trial, including actual damages, treble damages, punitive damages, attorneys' fees, and costs.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A. Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Class; and declare Plaintiff as the representatives of the Class;

B. Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Class;

C. Award the Class damages in an amount to be determined at trial;

D. Permanently enjoin Defendants' ongoing unlawful conduct;

E. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: March 3, 2026

Respectfully submitted,

**WEBSTER BOOK LLP**

By: */s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
2300 Wilson Blvd., Suite 728
Arlington, Virginia 22201
Telephone: (888) 987-9991
stw@websterbook.com

Steve W. Berman (*pro hac vice* forthcoming)
Jerrod Patterson (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Leonard Bellavia (*pro hac vice* forthcoming)
**Bellavia Cohen P.C.**
200 Old Country Road, Suite 400
Mineola, NY 11501
Telephone: (516) 873-3000
Fax: (516) 873-9032
lbellavia@dealerlaw.com

*Attorneys for Plaintiffs*